SEREN LEGAL

K. Kasey Corbit SBN 237931
SEREN LEGAL
495 Miller Ave., Suite 304
Mill Valley, CA 94941
Telephone: (415) 407-1872
E: kasey@seren.legal
Attorney for Plaintiffs JOHN MENDONCA and GLACKIN, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JOHN KAHAKILI MENDONCA and GLACKIN, LLC, a Hawaii limited liability company,

Plaintiffs,

v.

JPMORGAN CHASE BANK, N. A., a national banking association; and DOES 1-50, inclusive,

Defendants.

CASE NO.: 5:26-CV-05479-SVK

**FIRST AMENDED COMPLAINT FOR:**

1. **AIDING AND ABETTING FRAUD;**
2. **AIDING AND ABETTING CONVERSION; AND**
3. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. This action arises from one of the most brazen Ponzi schemes to pass through the books of a major American financial institution in recent memory. Over a period of years, from at least January 2021 through March 2024, Mark Anthony Sawyer ("Sawyer"), individually and through his various entities, particularly ACM North, LLC ("ACM North"), defrauded hundreds of investors by falsely promising short-term, high-yield bridge loan returns. Sawyer

represented that these loans either were purportedly secured by real estate in the San Jose, California area or were intended to support the expansion of already successful businesses.

2. During all relevant times stated herein, Mark Anthony Sawyer held a California Lender and Broker License (CFL No. 6053860) and a California Mortgage Loan Originator's License (CA-DOC217438). Both of these licenses were registered to 1905 O'Toole Way, San Jose, from which his entity ACM North, LLC operated. Sawyer's entity MAS Holdings Group was registered to 1975 O'Toole Way, San Jose.

3. Plaintiffs are informed and believe, and based thereon allege, that not one dollar of those investor funds from at least January 2021 on, was invested in any legitimate bridge loan. It was all a fiction in which Defendant JPMorgan Chase Bank, N.A. ("CHASE") was a major player.

4. On or about January 20, 2026, the California Department of Financial Protection and Innovation (DFPI) issued a cease and desist order to Sawyer and his entities, determining that "[f]rom at least October 1, 2017 through at least July of 2023, ACM North, by and through Sawyer, solicited investors to participate in the ACM North Bridge Loan Program", that "Investments in the Program constitute securities under California Corporations Code section 25019. ACM North was not qualified to offer or sell securities in California," and that "the securities offered or sold by ACM North LLC, by and through Sawyer, were not exempt and were subject to qualification under the CSL and have been or are being offered or sold without first being qualified in violation of Corporations Code section 25110." Sawyer ran this operation out of his San Jose offices and primarily through Defendant CHASE's San Jose branches.

///





SEREN LEGAL

5. Plaintiffs are informed and believe, and based thereon allege, that nearly every wire transfer, intra-bank diversion, and branch-level extraction that constituted the scheme flowed through CHASE. CHASE's own records identify more than 371 unique remitters since January 2021 who wired funds into ACM North's CHASE account ending x3055 during the fraud period, generating gross deposits exceeding $170,000,000. Plaintiffs John Kahakili Mendonca and Glackin, LLC are among the investors defrauded by that scheme.

## PARTIES

*A. Plaintiff*

6. Plaintiff JOHN KAHAKILI MENDONCA is an individual with his principal place of residence in Honolulu County, Hawaii, and is a citizen of Hawaii for purposes of federal diversity jurisdiction, which is a state other than Ohio. Plaintiff GLACKIN, LLC is a limited liability company organized under the laws of the State of Hawaii; Plaintiff John Kahakili Mendonca is its managing member, and no member of Glackin, LLC is a citizen of Ohio, such that Glackin, LLC is a citizen of Hawaii. Plaintiff Mendonca wired a total of $1,500,000, and Plaintiff Glackin, LLC wired a total of $1,300,000, to ACM North's CHASE account x3055 in reliance on Sawyer's fraudulent representations that the funds would be used for short-term bridge lending, would be repaid with interest, and were safe. None of those representations was true. Sawyer converted Plaintiffs' funds to his personal use via the CHASE banking infrastructure described herein, all while CHASE stood by, collected fees, and looked the other way. Plaintiffs have recovered nothing.

///

///

SEREN LEGAL

*B. Defendant*

7. Defendant CHASE is a national banking association chartered under the laws of the United States. CHASE's main office, as designated in its articles of association, is located in Columbus, Ohio. CHASE is the second-largest bank in the United States by assets and one of the largest financial institutions in the world. At all times relevant to this Complaint, CHASE operated banking branches throughout California, including multiple branches in Santa Clara County in the Northern District of California, from which Sawyer's accounts were serviced and at which AML obligations were triggered.

8. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 50, inclusive, are unknown to Plaintiffs at the time of filing this Complaint, and Plaintiffs will amend this Complaint to assert the true names and capacities of those Defendants when they are ascertained. Plaintiffs are informed and believe, and based thereon allege, that the Defendants and each of them aided and abetted one another in committing the acts set out herein. Plaintiffs allege that each of the DOE Defendants is responsible in some manner for the events and happenings referred to herein and proximately caused Plaintiffs' injuries and damages. Each reference in this Complaint to "CHASE" also refers to Does 1 through 50 to the extent their acts are attributed to CHASE.

## **JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs, as to each Plaintiff. Complete diversity exists between Plaintiffs — John Kahakili Mendonca, a citizen of Hawaii, and Glackin, LLC, whose

SEREN LEGAL

managing member is Mr. Mendonca and no member of which is a citizen of Ohio, and which is therefore a citizen of Hawaii — and Defendant CHASE, which is a national banking association whose main office is located in Columbus, Ohio, and which is therefore a citizen of Ohio for diversity purposes. *See* 28 U.S.C. § 1348; *Wachovia Bank, N.A. v. Schmidt,* 546 U.S. 303 (2006).

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Specifically: (a) ACM North LLC's primary CHASE business checking account x3055 was serviced by CHASE branches in the Northern District of California, including branches in the San Jose area where the account originated; (b) the ACM North account was opened at Washington Mutual's San Jose branch in October 2006, at the address 2051 Junction Ave., Suite 230, San Jose, California, the same address that appears on Sawyer's personal account and multiple related entity accounts; (c) CHASE relationship bankers at the Coleman Avenue Branch 744098 in San Jose, California opened and administered Sawyer-affiliated accounts including MAS Financing and MAS Holdings Group LLC; (d) CHASE maintained and processed the wire transfers and branch-level transactions at issue from this District. The ACM North accounts were administered using a San Jose, California phone number (408-392-0932), which appeared in the Originator Beneficiary Information ("OBI") field of investor wire transfers received at CHASE; and and (e) the promissory notes between Plaintiff and Sawyer contain the following language, "All duties and obligations of the parties created hereunder are performable in Santa Clara County and shall be the venue for any action or proceeding that may be brought or arise out of, in connection with or by reason of this Agreement."

SEREN LEGAL

11. Assignment to the San Jose Division of this District is appropriate because the operative facts of this case are substantially connected to Santa Clara County, California.

## GENERAL FACTUAL ALLEGATIONS

12. CHASE was not a passive conduit in Sawyer's Ponzi scheme. CHASE had maintained banking relationships with Sawyer and his entities since at least 2006, a relationship that CHASE inherited from Washington Mutual in 2008 and that continued for another seventeen years.

13. Since well before January 2021, CHASE simultaneously served as (1) the receiving bank for investor wires into ACM North account ending x3055; (2) the processing bank for hundreds of intra-bank transfers from that account to Sawyer's personal accounts at CHASE; and (3) the executing institution for tens of millions of dollars in large-denomination branch-level transactions at CHASE branches, including untraced "Other Withdrawal" line items and "Cash In Ticket" deposits that Plaintiffs' own supporting documentation establishes were, in substantial part, cashier's checks and intra-CHASE account-to-account transfers rather than physical currency. All three functions occurred entirely within CHASE's own systems, with full institutional visibility, at each and every step.

14. CHASE's automated anti-money laundering ("AML") systems processed every one of these transactions. By the time of the closure of the ACM North account, CHASE's records reflected: over $170,000,000 in deposits to a single DBA checking account registered to a sole proprietor <u>in just two years</u>; seventy-two large-denomination withdrawals totaling approximately $23,200,000, the largest of which was $3,900,000; nearly $20,000,000 in intra-bank transfers from the business account to personal accounts held by the same customer; and a complete account collapse from a beginning balance of $3,950,000 to effectively zero,

SEREN LEGAL

despite gross inflows exceeding $170 million. No legitimate business produces this pattern. No functioning AML compliance program fails to flag it.

***A. The Sawyer/ACM North Fraud Scheme***

15. Mark Anthony Sawyer ("Sawyer") is currently a Nevada resident, though his California lending license was registered with the California Department of Financial Protection and Innovation to an office located at 1905 O'Toole Way, San Jose, from when he first obtained it in 2007 until 2025. At all relevant times, Sawyer held himself out as a bridge loan specialist and financial services provider.

16. Through his entity ACM North, LLC ("ACM North"), a Nevada limited liability company, Sawyer solicited investors with a consistent and fraudulent pitch: investors would provide short-term capital, characterized as bridge loans, that Sawyer, through ACM North, alleged that he would deploy in real estate transactions and business expansion efforts. Investors were promised short loan terms of approximately 90 days, guaranteed returns of up to twenty-eight percent. Sawyer advised investors that he had promissory notes securing the bridge loans with real property, regardless of the purpose of the bridge loans.

17. Sawyer created a professional veneer for the scheme through fabricated "loan account statements" that listed fictional loan periods, returns, fees, and "roll" instructions, inviting investors to re-invest maturing balances into "the next loan opportunity," which most investors did, often after receiving an initial payout to confirm the legitimacy of the scheme. Sawyer used these documents to forestall redemption demands and to solicit additional investment. The scheme relied entirely on the continued flow of new investor funds to maintain the illusion of operation.

SEREN LEGAL

18. Over the course of the following years, Sawyer opened a series of additional business accounts at CHASE, including accounts for the following entities, each of which was administered through CHASE branches in the Las Vegas and San Jose areas: MAS Financing (DBA, x2914, opened 2010 at CHASE's Coleman Avenue Branch, San Jose); MAS Holdings Group LLC (x3003, opened 2011, Coleman Avenue Branch, San Jose); Lighthouse Holdings Group LLC (x8683, opened 2013); MAS Solutions Group LLC (x5866, opened 2014); 3T Entertainment LLC (x7539, opened 2017); BAMF Global Technologies LLC (x3172, opened 2020); and JABM Enterprises LLC (x1631). The joint account x6213, held in the names of Mark A. Sawyer and Jennifer Ann Sawyer, was opened September 27, 2019. Sawyer used these accounts to either receive new investor funds, receive transfers from the ACM North x3055 account, and/or layer or disguise the origin of investor funds before liquidating the money for his and his family's use.

19. Sawyer also represented to Plaintiffs, and others, that CHASE actively participated in the bridge loan process by serving as escrow officer for the transactions. The purported involvement of the bank added credibility to Sawyer's scheme.

20. Unfortunately, none of Sawyer's representations regarding use of the investment funds for bridge loans, at least as of January 2021, were true. ACM North was not engaged in legitimate lending, nor were any of the other entities. The funds received from investors were not used for bridge loans. No real estate collateral existed. Rather, Sawyer operated a Ponzi scheme in which early investors were paid with funds from later investors, and the bulk of investor funds were converted by Sawyer to his personal use through branch-level extractions and intra-bank transfers to personal accounts, all of which occurred at CHASE.

///

21. When investors, including Plaintiffs, made demands for payment, Sawyer crafted a narrative that his account had been frozen due to government investigation of other individuals involved in bridge loan schemes, causing a nationwide crackdown on bridge loan accounts. The truth is that Sawyer had drained the ACM North x3055 by the end of April 2023.

22. Plaintiffs are informed and believe, and based thereon allege, that Sonya L. Berg, another Sawyer victim, who wired $500,000 to ACM North on June 6, 2022, filed a formal complaint with CHASE's Executive Office in or around November 2023. Ms. Berg's complaint was assigned CHASE case number ECW231101-00215. Plaintiffs are informed and believe, and based thereon allege, that by the time CHASE received Ms. Berg's complaint, the ACM North x3055 account had been closed; the final ACM North investor deposit, a $250,000 wire, posted on March 29, 2023, and the x3055 account was closed in May 2023.

23. Plaintiffs are informed and believe, and based thereon allege, that CHASE responded to Ms. Berg's complaint in November 2023 and advised her that the ACM North x3055 account was closed and instructed her to call law enforcement.

24. Plaintiffs are informed and believe, and based thereon allege, that another victim, Stan Solomson, also called to lodge a complaint sometime after Ms. Berg's complaint was registered and also received an instruction from CHASE to call law enforcement.

25. The Sawyer scheme, however, did not end with the closure of x3055 and did not even end with CHASE's instructions to victims to contact law enforcement. Sawyer continued to solicit and receive investor funds, using the same fraudulent bridge-loan pitch, directly into his personal CHASE checking account ending x5464, which received approximately $6,750,000 in additional deposits over the following twenty-three months after the closure of x3055, including direct Fedwire credits from third-party individuals whose Originator Beneficiary

SEREN LEGAL

Information fields referenced "bridge loan," "investment," and "lending" arrangements consistent with the ACM North victim profile. Plaintiffs are informed and believe, and based thereon allege, that CHASE's Executive Office was reviewing Ms. Berg's and Mr. Solomson's fraud complaints while x5464 simultaneously continued receiving and cycling investor funds in the same fraudulent pattern. Plaintiffs are informed and believe, and based thereon allege, that after receiving and reviewing these complaints, CHASE took no action to freeze x5464 or any other Sawyer-controlled account, to file a Suspicious Activity Report, or otherwise to interrupt the successor flow.

26. Had CHASE performed its duties, as set out herein, Sawyer's fraud would have been detected years sooner. Instead, CHASE, knowing of the nature of the business, the impossibility of the promised returns, the extraordinarily high cycling of the account, its use to feed multiple other Sawyer-owned and controlled accounts, as well as the complaints, and, despite having directed individuals to contact law enforcement, allowed Sawyer to take new investment funds into his other accounts, lending credence to Sawyer's false narrative about the ACM North account being subject to a government hold.

27. The scheme is now the subject of one or more California civil judgments held by victims of the scheme. *See infra* for further details of collection exhaustion efforts.

***B. Plaintiffs' Investments***

28. Plaintiff John Kahakili Mendonca wired a total of $1,500,000, and Plaintiff Glackin, LLC wired a total of $1,300,000, to ACM North's CHASE account x3055 during 2021 and 2022 in reliance on Sawyer's fraudulent representations that the funds would be used for short-term, secured bridge lending, would be repaid with interest, and were safe. None of those representations was true. Sawyer converted Plaintiffs' funds to his personal use via the

CHASE banking infrastructure described herein, all while CHASE stood by, collected fees, and looked the other way. Plaintiffs have recovered nothing.

***C. CHASE's Seventeen-Year Relationship with Sawyer***

29. CHASE's relationship with Mark Sawyer and ACM North did not begin in 2021. The ACM North business checking account (ultimately assigned account number ending x3055) was first opened at Washington Mutual's San Jose, California branch in October 2006, under a Business Master Account Agreement signed October 3, 2006. CHASE acquired Washington Mutual in September 2008 and inherited the ACM North account along with the rest of the WaMu portfolio.

30. The ACM North account's October 2006 origin is significant. CHASE's relationship with Sawyer and ACM North spans seventeen years and encompassing the entirety of Sawyer's documented enterprise. A financial institution managing a relationship of this duration accumulates substantial transactional history and customer knowledge that its AML systems are designed to apply when evaluating suspicious activity. CHASE therefore cannot credibly claim that the patterns visible in 2021 and beyond were novel or that it lacked the institutional context necessary to identify them.

31. CHASE also inherited Sawyer's personal checking account, opened at Washington Mutual on October 20, 2008 (three weeks after CHASE's WaMu acquisition) and subsequently assigned account number ending x5464 at CHASE. Critically, the WaMu account opening documents for the x5464 personal account identify Sawyer's employer as "SELF EMP / ACM NORTH." From the moment CHASE took custody of these accounts, CHASE's own inherited KYC records documented the direct financial relationship between Sawyer personally and ACM North, the same entity through which the fraud would be conducted.

32. CHASE opened an estimated thirty-one separate accounts associated with Sawyer and his controlled entities, the majority of which were open and active concurrently during the fraud period. These accounts were serviced across at minimum five separate CHASE branches and opened by at least six different CHASE relationship bankers over a span of seventeen years. This is not a case of a new customer engaging in sudden suspicious activity. CHASE had a deep, multi-decade, multi-branch, multi-entity institutional relationship with Mark Sawyer that, at its peak, encompassed more than thirty concurrent active accounts. Using multiple accounts without a legitimate reason for doing so is a flag for money laundering activities.

***D. CHASE's Systematic KYC Failures Across the Sawyer Portfolio***

33. Throughout the fraud period and for years preceding it, Sawyer maintained personal and joint banking relationships with CHASE at the CHASE Private Client tier. Sawyer's personal checking account x5464 and the joint checking account x6213 held with Jennifer A. Sawyer are both CHASE Private Client Checking products. CHASE Private Client is a designated banking tier within CHASE reserved for higher-net-worth retail customers, which CHASE markets as providing a dedicated CHASE Private Client Banker, a dedicated Senior Private Client Advisor for J.P. Morgan investment needs, fee waivers across a broad range of services, and elevated relationship-level review. Eligibility for the CHASE Private Client tier requires the maintenance of an average daily balance of approximately $150,000 across qualifying CHASE deposit and J.P. Morgan investment accounts.

34. Sawyer's continuous Private Client status throughout the relevant period therefore necessarily entailed (i) the assignment of a dedicated CHASE relationship banker with continuing responsibility for the Sawyer account relationship, (ii) periodic relationship-level account reviews of the type ordinarily conducted for Private Client customers, and (iii) recurring





SEREN LEGAL

documentation by CHASE of Sawyer's qualifying balances—balances that during much of the fraud period were sustained substantially by funds traceable to investor wires received into the ACM North x3055 account and subsequently transferred intra-bank into x5464 and x6213.

35. Despite this extended relationship, CHASE's Know Your Customer ("KYC") process for Sawyer's entities was systematically deficient. At two separate CHASE branches, serving Sawyer in San Jose and Las Vegas and spanning seven years, CHASE relationship bankers accepted "Website Documentation" as the sole primary KYC identifier for multiple distinct Sawyer entity account openings—a non-standard identifier that, on its face, should not constitute adequate verification of the identity of a legal entity customer under Bank Secrecy Act Customer Identification Program ("CIP") requirements.

36. CHASE seems to recognize that its KYC protocol is insufficient as its website currently advises clients who are seeking information on its KYC protocol, "KYC refers to Know Your Customer procedures that MSBs are required to implement to verify the identity of their customers. We will be undergoing a KYC renewal process. This will help us obtain a complete and up-to-date understanding of your business. It may require additional documentation to verify your identity and business operations."[1]

37. At the Durango and Dorrell Branch (Branch 119183) in Las Vegas, Nevada, CHASE relationship banker Ashley M. Clayton (telephone: (702) 839-0079) opened the BAMF Global Technologies account (x3172) on March 6, 2020, prepared the JABM Enterprises change certificate on September 10, 2020, and opened or updated the ATD Commerce

[1] CHASE's "Know Your Customer (KYC) Requirements" web page, https://www.chase.ca/en/help/kyc, last visited June 2, 2026.





SEREN LEGAL

SEREN LEGAL

account (x1211) in or about April 2021—three Sawyer entity transactions executed by the same CHASE relationship banker at the same branch within a thirteen-month period, using "Website Documentation" as the sole KYC identifier on each occasion.

38. CHASE relationship banker Carlos P. Bega (telephone: (702) 207-1172) had previously opened the 3T Entertainment account (x7539) at the same branch in August 2017.

39. At the Tropicana Branch (Branch 740956) in Las Vegas, Nevada, CHASE relationship banker Kristin A. Leupold (telephone: (702) 597-2226) opened the Lighthouse Holdings Group LLC account (x8683) on August 22, 2013 and, within six months, opened MAS Solutions Group LLC account (x5866) on February 20, 2014, again using "Website Documentation" as the sole primary KYC identifier on both occasions, and with both entities sharing the same registered business address.

40. KYC validation is an ongoing obligation, not a one-time event for banks. A KYC process is designed to help the bank to build an understanding of the nature of the customer's activity. CHASE made no such effort here, even though it was obligated to and even though Sawyer and his entities engaged in a number of anomalous transactions.

41. This recurring KYC failure, the same inadequate identifier and lack of information accepted by four different bankers across two different branches spanning a seven-year period, is institutional, not individual. It reflects a systemic culture at CHASE that permitted repeated, legally insufficient entity verification without triggering secondary review or escalation protocols.

42. The relationship banker(s) assigned to Sawyer at the Private Client tier would have had direct, ongoing visibility into Sawyer's personal account activity throughout the fraud period, including the recurring intra-bank transfers from x3055 (an account into which more than

$170,000,000 in investor wires were deposited during the fraud period) to x5464 (Sawyer's personal CHASE Private Client account) totaling more than $18,100,000, and including the maintenance of Sawyer's qualifying Private Client balances, which derive substantially from those funds.

***E. The Fraud Period: January 2021 Through March 2024***

43. The core fraud period analyzed from CHASE's bank records runs from January 2021 through March 2024. From January 2021 through May 2023, ACM North's CHASE account x3055 received approximately $170,000,000 in total deposits. The account simultaneously bled these inflows through three primary channels, all of which were within CHASE's systems: (a) large-denomination branch-level withdrawals (a category that, on the present record, includes confirmed cash extractions and a substantially larger volume of "Other Withdrawal" line items); (b) intra-bank transfers to Sawyer's personal and other entity accounts; and (c) checks to numerous payees. By mid-2023, the account had been fully drained despite receiving more than $170 million in inflows over twenty-nine months.

44. The following quantified transaction categories have been identified in ACM North's x3055 CHASE records from January 2021 until the account closure in May 2023:

a. Total deposits to x3055 (Jan. 2021 – May 2023): approximately $170,000,000;

b. Branch-level withdrawals: Sawyer posted approximately $28,275,350 in "Other Withdrawal" line items posted to the x3055 account on CHASE's own monthly statements during the fraud period, of which seventy-two (72) individual large-denomination events totaling approximately $23,200,000 (the largest such transaction was $3,900,000 and many other days featured multiple same-day extractions). These are examples of anomalous transactions that put CHASE on notice that Sawyer's



SEREN LEGAL

account activity was suspicious and transactions that CHASE executed knowingly that facilitated the fraud. Some specific incidents include:

| Date of Transaction | Amount of Transaction | Nature of Transaction |
|---|---|---|
| 1/5/2021 | $100,000 | Counter withdrawal with no accompanying indication a cashier's check was issued |
| 3/29/2021 | $3,900,000 | Counter withdrawal with no accompanying indication a cashier's check was issued |
| 10/08/2021 | $625,000 | Counter withdrawal with no accompanying indication a cashier's check was issued |
| 10/12/2021 | $500,000 | Counter withdrawal with no accompanying indication a cashier's check was issued |
| 4/09/2022 | $875,000 | Counter withdrawal with no accompanying indication a cashier's check was issued |
| 5/14/2022 | $500,000 | Counter withdrawal with no accompanying indication a cashier's check was issued |
| 5/18/2022 | $500,000 | Counter withdrawal with no accompanying indication a cashier's check was issued |
| 5/24/2022 | $1,000,000 | Counter withdrawal with no accompanying indication a cashier's check was issued |

c. The above chart is representative and not comprehensive. To list all seventy-two (72) incidents would render the complaint unnecessarily unwieldy.

d. Branch-level deposits recorded by CHASE on "Cash In Ticket" currency-denominated forms: 389 such entries totaling $28,860,161 were posted to the x3055 account between January 5, 2021 and April 10, 2023, of which 349 individual entries were $10,000 or greater. Documentation obtained by Plaintiffs establishes that CHASE's "Cash In Ticket" entries during the fraud period included substantial deposits of cashier's checks issued by other institutions and, in some cases, intra-CHASE account-to-account transfers, rather than physical currency. The recurrent use of CHASE's currency-coded deposit form to record non-currency negotiable instruments is itself an AML and KYC anomaly, the precise composition of which



SEREN LEGAL

remains subject to further discovery. Some examples of these anomalous and suspicious transactions, which were performed by CHASE tellers at CHASE branches, include:

| Date of Transaction | Amount of Transaction | Nature of Transaction |
|---|---|---|
| 1/5/21 | $1,000,000 | "Cash-In" ticket with no accompanying cashier's check |
| 2/16/21 | $360,000 | "Cash-In" ticket with no accompanying cashier's check |
| 10/8/21 | $452,000 | "Cash-In" ticket with no accompanying cashier's check |
| 12/15/22 | $1,000,000 | "Cash-In" ticket with no accompanying cashier's check |
| 12/30/22 | $100,000 | "Cash-In" ticket with no accompanying cashier's check |
| 1/6/23 | $100,000 | "Cash-In" ticket with no accompanying cashier's check |
| 1/6/23 | $250,000 | "Cash-In" ticket with no accompanying cashier's check |
| 2/6/23 | $95,000.00 | "Cash-In" ticket with no accompanying cashier's check |

e. The above chart is representative and not comprehensive. To list all 389 incidents would render the complaint unnecessarily unwieldy.

f. Intra-bank transfers from ACM North x3055 to Sawyer personal accounts x5464 and x6213: more than 130 transactions totaling approximately $19,919,797.

///

///

///

///

///

///

///



SEREN LEGAL




g. The above chart is representative and not comprehensive. To list all 130 incidents would render the complaint unnecessarily unwieldy.

h. Finally, beginning account balance (January 2021): approximately $3,950,000; ending balance (mid-2023): effectively $0.00.

45. The withdrawal activity from ACM North x3055 was particularly alarming. On October 1, 2021, alone, two same-day large-denomination withdrawals totaling $797,606 were posted to the account—a pattern that, to the extent processed as currency, would have triggered automatic Currency Transaction Report ("CTR") obligations under 31 U.S.C. § 5313, and that, regardless of underlying instrument type, mandated immediate AML alert escalation under CHASE's own compliance policies.

46. During a thirty-two-day window from May 16 through June 17, 2022, five additional large-denomination withdrawals totaling $2,071,026 were executed from the ACM North x3055 account in rapid succession: $500,000 (May 16), $500,000 (May 18), $500,000 (May 24), $471,026 (May 25), and $100,000 (June 17). This acceleration in outbound withdrawals in mid-2022 followed a sustained period of large investor inflows into the account.



SEREN LEGAL

SEREN LEGAL

***F. The Intra-Bank Transfer Web: CHASE's Full Visibility***

47. A total of approximately $19,919,797 was transferred from ACM North x3055 to Sawyer's personal accounts x5464 and x6213 by way of intra-bank transfers—transfers that occurred entirely within CHASE's own computing infrastructure, without any correspondent bank processing, and with instantaneous and complete visibility to CHASE's compliance systems at every step.

48. Because CHASE served simultaneously as the bank for both the sending account (ACM North x3055) and the receiving accounts (Sawyer personal x5464 and joint x6213), CHASE was not merely a passive recipient of wire transfer information from a third-party institution. CHASE was the only bank involved. Every dollar that moved from the ACM North business account to Sawyer's personal checking account traveled over CHASE's internal ledger, was recorded by CHASE's core banking system, generated a fee for CHASE, and was visible in real time to every CHASE compliance function that had access to account activity data—including the AML transaction monitoring systems that CHASE is required by law to maintain.

49. The largest single intra-bank transfer from ACM North x3055 to Sawyer's personal account identified in the records was $925,000 on December 14, 2021 (transaction number 13232687612). Additional large transfers included $600,000 on December 7, 2021 (transaction 13183027046); $500,000 on January 13, 2021 (transaction 10994993489); $453,000 on December 19, 2022 (transaction 16066603891); and more than a dozen additional transfers in excess of $200,000 each. These transfers occurred multiple times per week throughout the fraud period. They are grossly inconsistent with any legitimate payroll or business expense pattern.

50. The last few months the ACM North x3055 account was open, naturally, were of significant concern. In February 2023, the account had been reduced to $115,576.52. Despite receiving deposits of $1,282,258.28, the account ended the month with only $3,301.37. During February 2023, Sawyer transferred:

| Transaction Date | Amount | Destination |
|---|---|---|
| 2/3/23 | $10,000 | Checking x6213 |
| 2/6/23 | $15,000 | Checking x5464 |
| 2/6/23 | $1,000 | Credit Card x2406 |
| 2/6/23 | $3,000 | Checking x5464 |
| 2/9/23 | $11,000 | Checking x6213 |
| 2/13/23 | $3,000 | Credit Card x2406 |
| 2/13/23 | $3,500 | MAS Holdings 2 x3003 |
| 2/13/23 | $20,000 | Checking x5464 |
| 2/17/23 | $1,000 | Credit Card x9431 |
| 2/17/23 | $14,000 | Checking x5464 |
| 2/21/23 | $4,000 | Checking x5464 |
| 2/21/23 | $300 | Checking x5464 |
| 2/24/23 | **$100,000** | Checking x5464 |
| 2/27/23 | $3,500 | MAS Holdings 2 x3003 |
| 2/27/23 | $40,000 | Checking x5464 |

51. Further, on February 1, 2023, Sawyer received a $100,000 wire and a $100,000 check from investors. Sawyer withdrew $100,000 himself and then issued a $100,000 wire to a prior



SEREN LEGAL

SEREN LEGAL

investor. This is a hallmark of a Ponzi scheme. Considering the account had little more than $100,000 in it on the first, and the rapidly declining monthly opening balance, the activity should have triggered AML evaluations.

52. In March 2023, a similar pattern played out, albeit a lower-level one because most of the money in the account had been drained. The ACM North x3055 account started with a balance of $3,301.37. It received $257,000 in deposits, which was comprised of one $250,000 wire and four transfers from Sawyer's x5464 account totaling $7,000. Despite this, Sawyer turned around and transferred $25,400 back into the x5464 account. Sawyer also withdrew $126,000 on March 31, leaving the account with $648.79. Plaintiffs are informed and believe, and based thereon allege, that Sawyer withdrew this amount in cash.

53. Of course, Sawyer had been engaging in this behavior for years and CHASE not only permitted it, CHASE assisted Sawyer by failing to put holds on transactions that would have triggered holds for any other customer.

### *G. The Multi-Account Layering Web: x3055 as the Hub of an Intra-CHASE Transfer Network*

54. The intra-bank transfers from ACM North x3055 to Sawyer's personal and joint accounts were not the only intra-CHASE movement of investor funds. The x3055 account sat at the center of a broader layering network that operated entirely within CHASE's own ledger, in which investor funds were moved among ACM North x3055, Sawyer's personal hub account x5464, and a series of Sawyer-controlled entity accounts at CHASE—including BAMF Global Technologies x3172, JABM Enterprises x1631, 3T Entertainment x7539, MAS Financing x2914, MAS Holdings Group x3003, and Lighthouse Holdings Group x8683—before a portion of those funds was disbursed to outside payees and third parties. Each of these accounts was opened by Sawyer or a Sawyer-controlled entity at CHASE, was identified

SEREN LEGAL

in CHASE's own Know Your Customer records as associated with Sawyer, and was funded in whole or in part by transfers traceable to the ACM North investor inflows. Because every account in the network was maintained at CHASE, each transfer among them was a book transfer executed on CHASE's internal ledger, generated a record in CHASE's core banking system, and was visible in real time to CHASE's compliance and transaction-monitoring functions. No correspondent bank, intermediary, or external clearing system was involved at any point in the movement of funds among these accounts.

55. The following intra-CHASE movements, drawn from CHASE's own account records, illustrate the layering network and are pleaded with the specificity the partial documentation Plaintiffs have obtained. Plaintiffs allege on information and belief that these transactions are representative of a substantially larger volume of intra-network transfers, the complete enumeration of which is within CHASE's exclusive possession.

   a. Sawyer's personal account x5464 functioned as a redistribution hub, transferring funds outward to the entity accounts in the network—including recurring transfers of $100,000 to BAMF Global Technologies x3172 (for example, on January 5, 2021, transaction 10947584103; January 19, 2021, transaction 11025878539; and July 13, 2021, transaction 12167853284), recurring $100,000 transfers to JABM Enterprises x1631 (for example, January 19, 2021, transaction 11024083003, and February 23, 2021, transaction 11241959427), and transfers to 3T Entertainment x7539 (for example, $250,000 on February 25, 2021, transaction 11251107337)—even as x5464 was itself receiving more than $18,100,000 in transfers from the ACM North x3055 account.

///

b. Funds also moved back into the Ponzi account: x5464 transferred $200,000 to x3055 on February 9, 2021 (transaction 11162305630) and $100,000 to x3055 on each of August 10, 11, and 24, 2021 (transactions 12356686431, 12363666410, and 12446441490), and MAS Financing x2914 transferred a total of approximately $75,000 directly into ACM North x3055 across four Online Real-Time Transfers in March and October 2022, together with approximately $6,700 in additional transfers from x2914 to Sawyer's personal account x5464.

c. The MAS Holdings Group x3003 account operated as a dedicated layering conduit: it received recurring $3,500 transfers from x3055 (twice per month during 2021 through 2023, totaling approximately $185,500) and recurring transfers from Lighthouse Holdings x8683, and it disbursed approximately $617,500 in ninety-five (95) mechanically spaced transfers to a CHASE account ending x1779 held by Sawyer's ex-wife, as further described below. These reverse and circular flows—business Ponzi account to personal hub, personal hub to entity accounts, entity accounts back to the business Ponzi account, and business Ponzi account to layering conduit to third party—are hallmarks of layering and are inconsistent with any legitimate business or payroll purpose. Every transfer described in this paragraph was executed within CHASE's own systems and was visible to CHASE at the time it occurred.

***H. The "Further Forward" Wire Scheme and CHASE's Beneficiary Bank Role***

56. Investor funds entered the ACM North CHASE account x3055 as Fedwire credit transfers from other financial institutions, most prominently First Hawaiian Bank (ABA routing number 121301015). Every Fedwire credit transfer includes a structured data field called the





SEREN LEGAL

SEREN LEGAL

Originator Beneficiary Information ("OBI") field, a text field visible to the receiving bank at the time of posting, in which the sender records the purpose of the payment.

57. The OBI fields on all identified wire transfers from Plaintiff JOHN KAHAKILI MENDONCA into ACM North's CHASE account carry a uniform pretext. Each wire states, in substance: "Home Purchase John Mendonca — Further Forward ABA 322271627 JPMorgan Chase". The "Further Forward" notation is a specific instruction to CHASE as the beneficiary bank to pass the received funds through to a further, downstream destination, purportedly an escrow account or real estate closing account consistent with a legitimate property acquisition.

58. CHASE received this "Further Forward" notation on eight (8) different transfers from Plaintiff MENDONCA:

| **Date** | **Amount** | **Purpose for "Further Forward Designation"** |
|---|---|---|
| 8/27/2021 | $200,000 | Home Purchase |
| 8/27/2021 | $50,000 | Home Purchase |
| 10/1/21 | $250,000 | Home Purchase |
| 1/20/2022 | $100,000 | Home Purchase |
| 3/21/2022 | $50,000 | Home Purchase |
| 4/8/2022 | $500,000 | Commercial Building Purchase |
| 5/31/2022 | $250,000 | Purc Hase [sic] |
| 8/5/2022 | $100,000 | Home Purchase |

59. No such further transfer ever occurred. Not a single dollar received through these Fedwire credits was passed forward to a legitimate real estate escrow, closing agent, or title company.

SEREN LEGAL

Instead, the funds were retained in x3055 and subsequently dissipated through the branch-level extractions and personal transfers described above. CHASE, as the beneficiary bank receiving the "Further Forward" instruction on each of these wires, was in a position to verify, or flag the absence of, any corresponding outgoing transfer consistent with the stated purpose.

***I. Sawyer's Affirmative Representations to Investors Regarding CHASE's Operational Role***

60. On April 11, 2023, at which point the ACM North x3055 account had been drained to only a few hundred dollars, Sawyer and his then-employee Elke Stephenson hosted a Zoom call with hundreds of lender-investors in the ACM North bridge loan program. The call was documented in contemporaneous notes taken by a participant who is herself a victim and lender in the program. During the call, Sawyer made a series of specific factual representations to lender-investors regarding CHASE's operational role in the bridge loan program.

61. Sawyer represented to lender-investors on the April 11, 2023 call that there was "345 million currently in the escrow account at Chase" and that there was "a total of 685 million in bridges, including what's in escrow." This representation was material because it conveyed to lender-investors that CHASE was holding hundreds of millions of dollars of bridge-loan funds on their behalf in an escrow arrangement, and that CHASE was actively administering that escrow function.

62. Sawyer made additional specific factual representations to lender-investors on the April 11, 2023 call regarding CHASE's operational role: (a) that CHASE was processing bridge loans in "10 business days," characterizing CHASE as administering an active bridge-loan processing function; (b) that CHASE earned "$22,000 in processing fees for each bridge," conveying that CHASE engaged in Sawyer's business to make a profit, which lent credibility

SEREN LEGAL

to Sawyer's characterization of CHASE's active involvement in the scheme, which, itself, lent credibility to Sawyer's scheme; (c) that CHASE exercised "control" and "management" over the "6X collateral" purportedly securing each bridge, that the underlying real estate asset was "under Chase's management for the term of the bridge, and they can leverage it to make money for that 90-120 days"; (d) that the Sawyer accounts were "frozen" by CHASE in connection with a federal investigation of two individuals and one limited liability company among Sawyer's "client roster," and that "no money is moving out of the accounts at all right now"; (e) that Sawyer had filed an "exemption" application with CHASE that would, if approved, allow him to take a loan for three percent (3%) of the funds on hold, thereby giving him access to "about 10-15 million", and that he expected a decision "toward the end of this week"; (f) that Sawyer was "set to engage in a lawsuit against Chase" but had decided against doing so on the advice of counsel; and (g) that CHASE had received information from "a government agency with three initials" regarding the federal investigation of two individuals and one limited liability company among Sawyer's clients.

63. Each of the representations described in paragraphs 60 through 62, above, describes an operational arrangement, customer-specific service, or institutional communication between Sawyer and CHASE that is materially distinct from ordinary depository banking.

64. The April 11, 2023 representations identify a fundamental factual distinction between this matter and CHASE's prior experience as banker to Bernard L. Madoff Investment Securities LLC. In the Madoff matter, the operator passively exploited the CHASE brand by maintaining a depository account at CHASE while telling investors nothing operationally specific about CHASE's role; CHASE's liability nevertheless turned in significant part on its institutional knowledge of red flags despite Madoff's deliberate distance from active CHASE

involvement. In the matter before this Court, Sawyer did not merely use CHASE as a depository, he affirmatively portrayed CHASE to hundreds of lender-investors as an active operational participant in the bridge loan program, holding $345 million in escrow, processing bridge loans on a defined schedule for defined fees, managing real estate collateral, administering account freezes, and corresponding with federal agencies. The conduct alleged here is therefore a stronger case for institutional knowledge than Madoff, not a weaker one: where Madoff distanced his fraud from CHASE's brand, Sawyer wrapped his fraud in CHASE's brand. CHASE's engagement in atypical, anomalous transactions on behalf of Sawyer, including, but not limited to, receiving significantly large sums of cash in deposit and providing significantly large sums of cash in withdrawals, failing to place holds on Sawyer's accounts, facilitating transfers between Sawyer-owned and -controlled accounts allowed Sawyer to pull off his Ponzi scheme.

65. Sawyer's representations on the April 11 call were made to a population of approximately 200 to 300 active lender-investors. Plaintiffs are informed and believe, and based thereon allege, that Sawyer made materially identical representations regarding CHASE's operational role to other lender-investors on other occasions, both before and after April 11, 2023.

66. These representations either (i) reflect a pattern of fabrication by Sawyer that he used to give his Ponzi scheme operational plausibility, in which case the divergence between Sawyer's statements and CHASE's records is itself documentary evidence of the scheme's mechanism and of CHASE's failure to conduct customer due diligence sufficient to identify a scheme being conducted in CHASE's name for years; or (ii) reflect arrangements between Sawyer and CHASE beyond ordinary depository banking, the existence of which can only be confirmed through discovery of CHASE's records. Either alternative supports the aiding-and-



SEREN LEGAL

abetting and willful blindness theories pled herein. Under the first alternative, CHASE facilitated a Ponzi scheme that was actively wrapping itself in CHASE's brand without CHASE ever conducting customer due diligence sufficient to identify the misrepresentations being made in its name. Under the second alternative, CHASE's operational role in the scheme is, obviously, materially greater.

67. Sawyer's continued, partial payments to investors out of his other CHASE accounts lent false credibility to the account-restriction representations and operated both to perpetuate and to conceal the scheme. Having represented to lender-investors that CHASE had restricted his accounts in connection with a purported federal investigation, that the accounts were subject to a hold, that "no money is moving out of the accounts," and that he could obtain only limited, incremental access pending CHASE's decision on his purported "exemption" application, Sawyer used the continued flow of smaller payments from his remaining open CHASE accounts to make that explanation believable. Partial and sporadic repayments, each originated and cleared through CHASE, allowed Sawyer to represent to waiting investors that their funds were merely delayed or restricted rather than dissipated, to discourage redemption demands and complaints, and to solicit further investment and the "roll" of maturing balances into the next purported loan.

68. These lulling payments are a hallmark of Ponzi-scheme perpetuation: they sustain the illusion of a solvent, functioning enterprise at precisely the time the enterprise is collapsing, and they delay the point at which victims recognize their losses and seek redress. Every such payment was originated, processed, and cleared within CHASE's own systems, across accounts that CHASE's own records linked to ACM North and that CHASE continued to maintain and service after receiving inquiries and complaints regarding Sawyer's theft. CHASE's

SEREN LEGAL

continued provision of account and payment-processing services to Sawyer was therefore a substantial factor in sustaining the scheme's appearance of legitimacy and in delaying its discovery.

69. CHASE has direct institutional experience with the consequences of facilitating Ponzi schemes through willful blindness to account-level fraud indicators. From approximately 1986 through December 2008, CHASE served as the primary banking institution for Bernard L. Madoff Investment Securities LLC ("BLMIS"), maintaining the account, known internally as the "703 Account", through which virtually all of Madoff's approximately $65 billion Ponzi scheme was conducted. During that 22-year relationship, billions of dollars flowed through the 703 Account, yet virtually none of those funds were used to purchase or sell securities, as the account purported to do.

70. CHASE employees raised internal concerns about the legitimacy of Madoff's operations. In or around 2006 and 2007, bank personnel who were unable to replicate Madoff's reported returns raised questions at internal Underwriting Committee meetings and other reviews. At least one CHASE employee stated that there was "a well-known cloud over the head of Madoff" and that his returns were "speculated to be part of a Ponzi scheme." Despite these internal warnings, CHASE continued to maintain the account without reporting its suspicions to United States regulators.

71. In 2008, CHASE filed a Suspicious Activity Report with regulators in the United Kingdom regarding Madoff's operations, but did not file any corresponding SAR with the Financial Crimes Enforcement Network ("FinCEN") in the United States, as required by the Bank Secrecy Act, 31 U.S.C. § 5318(g).

///

SEREN LEGAL

72. In January 2014, CHASE entered into a Deferred Prosecution Agreement with the United States Attorney's Office for the Southern District of New York in connection with its role in the Madoff fraud. The bank was charged with two violations of the Bank Secrecy Act. The Deferred Prosecution Agreement described the bank's conduct as "willful." CHASE agreed to pay a $1.7 billion civil forfeiture to the Department of Justice and a $350 million penalty to the Office of the Comptroller of the Currency. The bank separately paid $218 million to settle a class action lawsuit brought by Madoff investors and $325 million to settle claims filed by the BLMIS Trustee, for total Madoff-related payments exceeding $2.6 billion.

73. As part of the Madoff resolution, CHASE committed to implementing enhanced AML compliance systems and protocols specifically designed to detect the account-level indicators of Ponzi schemes, including, without limitation, high-velocity deposit activity inconsistent with a customer's stated business, circular fund flows between investors and the account holder, rapid dissipation of account balances, and the absence of legitimate commercial revenue. Upon information and belief, those enhanced systems were operational during the entire period in which the ACM North account was maintained at CHASE.

74. The ACM North account exhibited precisely the indicators that CHASE's post-Madoff compliance systems were supposed to detect: over $170 million in deposits from more than 371 unique senders in approximately twenty-nine months; wire transfer memo fields explicitly identifying the deposits as "bridge loan" investments; outbound wires labeled "bridge payout" flowing to different individuals in the pattern of a classic Ponzi scheme; simultaneous intra-bank transfers to Sawyer's personal accounts; and a complete account collapse to a balance of $0.65 by May 2023. CHASE's failure to detect, if indeed that's what it was, investigate, or report these indicators—after having paid $2.6 billion for ignoring

materially identical indicators in the Madoff accounts—demonstrates, at minimum, willful blindness to the fraudulent nature of the ACM North operation. *See Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal.App.4th 1138, 1145–46 (2005).

75. CHASE is presently defending a proposed class action in this Court arising from materially identical allegations. In *Steele v. JPMorgan Chase Bank, N.A.*, Case No. 3:26-cv-02067 (N.D. Cal.)[2], investors in Goliath Ventures, Inc. allege that CHASE served as the sole banking institution for a $328 million cryptocurrency Ponzi scheme, processing approximately $253 million in deposits through a CHASE business account between January 2023 and June 2025. The *Steele* complaint alleges that CHASE ignored numerous red flags—including circular fund flows, rapid redistribution of investor deposits, and the absence of legitimate business revenue—while earning substantial fees from the transaction volume. The operator of the Goliath scheme, Christopher Alexander Delgado, was arrested on federal wire fraud and money laundering charges on February 24, 2026.

76. The pattern of conduct alleged in *Steele*, a bank maintaining a single business account through which hundreds of millions in investor funds cycle in a circular Ponzi structure, while the bank earns fees and chooses not to act on red flags that its own compliance systems are designed to detect, is functionally identical to CHASE's conduct with respect to the Sawyer scheme.

77. Courts in this and other districts have recognized that banks can be held liable for aiding and abetting fraud where they maintain accounts exhibiting the indicators present in the ACM North and associated accounts. In *Camenisch v. Umpqua Bank* (N.D. Cal.), a class of more

[2] This case has now been consolidated as part of multidistrict litigation regarding the same claims in the Middle District of Florida, MDL No. 3188.





SEREN LEGAL

than 1,200 investors in a $300 million real estate Ponzi scheme alleged that Umpqua Bank aided and abetted the fraud by maintaining the scheme's accounts despite knowing of the fraudulent activity. The court certified the class in December 2022, the case proceeded to a four-week jury trial in February 2025, and the parties settled for $55 million following a mistrial. At trial, evidence showed that Umpqua's automated transaction monitoring system had generated more than 100 red-flag alerts on the accounts at issue—alerts that were not investigated or acted upon.

78. Similarly, in *In re J&J Investment Litigation,* Case No. 2:22-cv-00529 (D. Nev.), investors in a $449 million litigation-finance Ponzi scheme brought aiding and abetting claims against Wells Fargo Bank, which maintained the attorney trust account through which all investor funds flowed. The operator had told Wells Fargo to expect $350,000 in annual revenue from the account; nearly $500 million subsequently flowed through it. In March 2023, the court denied the majority of Wells Fargo's motion to dismiss, holding that the gross disparity between the account's stated purpose and its actual activity, combined with specific transactional patterns inconsistent with the stated business model, was sufficient to state a claim for aiding and abetting fraud. That case remains pending.

79. Upon information and belief, CHASE's automated transaction monitoring systems, which were specifically supposed to be enhanced following the Madoff resolution, generated internal alerts, flags, or compliance reports regarding the ACM North account and/or the linked Sawyer accounts during the period January 2021 through March 2024. Upon further information and belief, those alerts were either not investigated, investigated and closed without appropriate remedial action, or investigated with a determination to continue maintaining the accounts despite the identified fraud indicators.

SEREN LEGAL

### *J. AML Red Flags Visible to CHASE*

80. Plaintiffs are informed and believe, and based thereon allege, that CHASE maintains automated AML transaction monitoring systems as required by the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 et seq., and its implementing regulations at 31 C.F.R. Part 1020. These systems are designed to automatically detect and flag suspicious transaction patterns by applying rules-based and algorithmic analysis to real-time and historical transaction data. The following categories of transactions and patterns, each visible to CHASE's systems throughout the fraud period, constitute red flags that any adequate AML compliance program would have detected and escalated:

a. Massive deposit throughput in a sole-proprietorship DBA account: $170,000,000 in deposits across twenty-nine months in a single DBA checking account registered to a sole proprietor is an extreme outlier by any metric applicable to this account type;

b. Systematic branch-level withdrawals: approximately $28,275,350 in "Other Withdrawal" line items recorded on CHASE's own monthly statements at the x3055 account during the fraud period, of which seventy-two (72) large-denomination events totaling $23,200,000 (the largest $3,900,000, with same-day clustering patterns) have been identified through forensic review. All of these withdrawals were executed at CHASE branch teller windows with full CHASE knowledge. Plaintiffs are informed and believe and based thereon allege that some portion of these were high-value cash withdrawals;

c. Mischaracterization of non-currency deposits on CHASE's "Cash In Ticket" currency forms: CHASE used its "Cash In Ticket" currency deposit form during the fraud period to record 389 entries totaling $28,860,161 in deposits to the x3055 account

SEREN LEGAL

between January 5, 2021 and April 10, 2023. Documentation produced directly to Plaintiffs establishes that these "Cash In Ticket" entries consisted in substantial part of cashier's checks issued by other institutions and intra-CHASE account-to-account transfers rather than physical currency. Three hundred forty-nine (349) of these entries were $10,000 or greater—the threshold at which CHASE's currency coding of the deposit would have triggered mandatory CTR filing obligations under the BSA. CHASE's recurrent use of currency-coded forms to record non-currency negotiable instruments across hundreds of transactions over a two-year period either (i) caused CHASE to file inaccurate CTRs reflecting non-currency activity as currency, (ii) caused CHASE to omit CTR filings notwithstanding its own currency coding of the deposits, or (iii) operated to defeat the integrity of CHASE's currency-transaction monitoring and reporting processes at the front-line teller level. Each of the three alternatives reflects, at a minimum, institutional indifference to the actual instruments being tendered at CHASE's branches;

d. Rapid commingling of business funds into personal accounts at the same bank: $19,919,797 in intra-bank transfers from the business account to personal accounts bearing the same individual's name, occurring multiple times per week;

e. Uniform OBI pretext with no corresponding outgoing transfers for every inbound wire bore a "Home Purchase" or "Commercial Building Purchase" instruction, yet no corresponding outgoing real estate escrow wire of comparable magnitude appears in the outflow record;

f. Complete account collapse: the account received in excess of $170,000,000 and yet reached a balance of effectively zero—a pattern consistent only with complete

SEREN LEGAL

dissipation of funds and wholly inconsistent with any legitimate commercial lending business;

g. Inconsistent transaction velocity: month-to-month deposit counts swinging by factors of two or more;

h. Concentration of high-value wires from Hawaiian financial institutions: a disproportionate percentage of large Fedwire credits from First Hawaiian Bank over an eighteen-month period;

i. Same-day, large-denomination withdrawal clusters: two same-day withdrawals on October 1, 2021 totaling $797,606—a pattern that, to the extent processed as currency, triggers mandatory CTR reporting obligations under the BSA, and that, regardless of underlying instrument type, triggers immediate AML escalation protocols under CHASE's own compliance policies; and

j. Diversion of investor funds to firearms and ammunition purchases through a CHASE-maintained credit card account: During the fraud period, Sawyer held CHASE Sapphire Reserve credit card account ending in x2406. Payments to that account were made directly from Sawyer's CHASE personal checking account x5464, which CHASE's own records for x5464 confirm with line items reading "Payment To Chase Card Ending IN 2406" and from the ACM North x3055 account, examples of which are outlined above

   i. Because CHASE maintained both x5464 and x2406, these card payments were intra-bank transactions processed entirely within CHASE's own computing infrastructure, with real-time visibility to CHASE's compliance systems. During the fraud period, credit card account x2406 recorded at least forty (40)

SEREN LEGAL

charges at firearms dealers, online Federal Firearms License ("FFL") dealers, shooting ranges, and ammunition retailers. Vendors included online FFL dealers in Rhode Island, Arkansas, North Carolina, Georgia, Indiana, Maine, and Kentucky. Because x5464 was funded by intra-bank transfers from ACM North x3055—themselves processed entirely within CHASE's own ledger systems—the complete chain of investor funds flowing from victim wire receipts to firearms purchases was visible to CHASE in real time at every step.

k. Disparate funds-availability treatment favoring the ACM North account: CHASE's own records reflect that CHASE applied materially different funds-availability treatment to deposits into the ACM North x3055 account than it applied to deposits into other customer accounts during the same period—including the account of one of its own customers whose check funded an ACM North deposit. On information and belief, CHASE extended same-day credit and availability to large third-party checks deposited into x3055, including a $2,000,000 check drawn by Clyde J. Berg on Heritage Bank of Commerce, dated October 26, 2021 and made payable to "ACM N.," which posted to x3055 as a same-day credit of $2,000,000 on October 26, 2021. A check of that magnitude, drawn on another financial institution, is precisely the category of transit item for which a depository bank ordinarily invokes its right under Regulation CC (12 C.F.R. Part 229) to place an exception hold pending collection.

i. During the same general period, CHASE did invoke that right against deposits into the account of Trivian, LLC (CHASE account ending x2226): by letters dated April 5, 2022 and August 13, 2022, CHASE notified Trivian that it had placed or extended holds on deposited checks—$99,775.00 (deposited April

SEREN LEGAL

1, 2022) and $59,775.00 (deposited August 11, 2022)—stating in each instance that "[t]he information we have indicates the deposited check(s) may not be paid." The contrast is sharpened by a same-customer, same-week comparison: while the April 2022 hold on Trivian's own incoming deposit remained in effect, CHASE extended same-day credit to ACM North x3055 on a $150,000.00 check drawn by Trivian, LLC, dated April 7, 2022 and payable to "ACM North," which posted to x3055 as a same-day credit on April 7, 2022. Because that check was itself drawn on a CHASE account, both the debit to Trivian's account and the credit to the ACM North account were processed entirely within CHASE's own ledger, in a single institution, with complete and contemporaneous visibility to CHASE's compliance systems. That CHASE was willing to withhold availability on smaller deposits into a customer's own account on the stated ground that the deposited checks "may not be paid," while extending same-day availability to large third-party checks deposited into the ACM North Ponzi account, reflects either a customer-specific funds-availability arrangement benefiting ACM North or a customer-specific decision not to apply to ACM North the deposit scrutiny CHASE applied to others, each of which is itself a relationship-level red flag and is inconsistent with the arm's-length treatment of an ordinary depositor. The precise availability terms applicable to x3055, and the existence of any expedited-availability, collected-balance, or relationship-level arrangement governing that account, are within CHASE's exclusive possession and are demanded in discovery.

SEREN LEGAL

81. Further, the velocity ratio of the ACM North account should have sounded alarms. The velocity ratio, defined as the total deposits divided by average balance, measures how many times each dollar in the account turns over during the period. For a typical operating business with normal A/R and A/P cycles, the figure runs between 4× and 12× annualized. For ACM North, the velocity ratio averaged 132×. Money entered and exited the account so rapidly that the average dollar resided there for less than three days. Worse, the velocity ratio accelerated as the scheme aged.

82. Similarly, the withdrawal-to-deposit (W/D) ratio, isolates whether an account is generating retained capital. Healthy operating businesses run W/D ratios well below one hundred percent; rather, they retain a margin. ACM North's W/D ratio averaged 102.3% across the 29-month period. In 18 of 29 months, or 62% of the time from January 2021 through closure, the account's outflows met or exceeded its inflows entirely. In twenty-seven of twenty-nine months (93%), the account retained less than twenty-five percent of inflows.

83. No business operates this way. A genuine bridge-loan lender deploying capital ought to retain origination fees, interest spreads, and reserves, producing a W/D ratio in the range of 60–80% with growing equity. ACM North retained nothing because it had nothing to retain. New investor money funded prior investor payouts and personal expenditures in real time.

84. Each of the foregoing indicators, viewed individually, would warrant AML scrutiny. Viewed in combination, and in the context of CHASE's seventeen-year relationship with Sawyer and its access to his full account portfolio, the aggregate picture presented by CHASE's own records establishes that no adequately functioning AML compliance program could have failed to generate high-priority suspicious activity alerts for the ACM North account throughout the fraud period.

***K. CHASE's Actual Notice: The Sonya Berg and Stan Solomson Complaints***

85. No later than November 2023, CHASE received direct actual notice that the ACM North account was the vehicle for investor fraud. As noted, an investor identified as Ms. Sonya Berg filed a formal complaint with CHASE's Executive Office regarding the loss of approximately $370,000. CHASE assigned the matter case number ECW231101-00215 and corresponded with Ms. Berg in connection with that complaint.

86. Plaintiffs are informed and believe, and based thereon allege, that despite receiving this direct investor complaint, which identified a specific Sawyer-controlled CHASE account and a specific investor loss, CHASE took no action to investigate the broader Sawyer banking relationship, to notify regulators, or to conduct any adequate review of related-account transaction history. Significantly, by the time CHASE received Ms. Berg's complaint in or about November 2023, the ACM North x3055 account had already been closed. The final ACM North investor deposit, a $250,000 wire, posted on March 29, 2023, and the x3055 account was closed in May 2023.

87. Unfortunately, as noted, the Sawyer scheme did not end with the closure of x3055. Sawyer continued to solicit and receive investor funds, using the same fraudulent bridge-loan pitch, directly into his personal CHASE checking account ending x5464 and the MAS Holdings 2 x3003 account.

   a. After May 2023, x5464 received approximately $6,750,000 in additional deposits over the following twenty-three months, including direct Fedwire credits from third-party individuals whose Originator Beneficiary Information fields explicitly referenced "bridge loan," "loan program," "investment," "business loan," and "lending" arrangements consistent with the ACM North victim profile. The x5464 account

SEREN LEGAL

functioned as the de facto successor to x3055, executing the same Ponzi cycling pattern that x3055 had executed during the fraud period: new investor inflows immediately disbursed, balance maintained near zero, and no legitimate commercial use of the funds. CHASE's Executive Office was actively reviewing Ms. Berg's fraud complaint at the same time x5464 was continuing to cycle investor money in this fraudulent pattern—confirming CHASE's institutional knowledge of the Sawyer scheme concurrent with its continued processing of new investor wires into Sawyer's personal account. CHASE took no action to connect the Berg complaint to x5464, to freeze x5464 or any other Sawyer-controlled account, to file a Suspicious Activity Report, or otherwise to interrupt the successor flow—and Sawyer's solicitation of new investors through his personal CHASE account continued without intervention until x5464 itself was rendered dormant in mid-2024. Had CHASE responded to Ms. Berg's complaint with any reasonable degree of due diligence into the broader Sawyer relationship that CHASE's own KYC records would have surfaced, the scope of loss to Plaintiffs and other similarly situated investors would have been reduced or eliminated.

i. Sawyer's personal CHASE Private Client account x5464 functioned as the de facto successor to x3055 for more than a year after the Berg complaint. In each statement period from November 2023 through July 2024—the very period during and after CHASE's Executive Office review of the Berg complaint—x5464 continued to receive and cycle deposits, including approximately $235,658 (November 2023), $71,849 (December 2023), $712,875 (December 30, 2023 through January 31, 2024), $133,638 (February 2024), $174,038

(March 2024), and $179,222 (late June through July 2024). As with x3055, the account was repeatedly drained to near zero between inflow waves, disbursed nothing to any legitimate real-estate escrow, and ultimately reached a balance of $0.00. Across the full period reviewed (January 2021 through November 2024), x5464 received approximately $24,500,000 in deposits, the entirety of which was dissipated through checks, electronic withdrawals, and outbound wires.

ii. Even after Ms. Berg's complaint, x5464 continued to receive Fedwire and other credits from individual remitters bearing the same investor and lending profile as the ACM North victims—including, among others, a February 14, 2024 credit carrying a lending designation, and a $70,740.29 wire received March 22, 2024 from an individual remitter with no stated commercial purpose. These post-notice credits are consistent with the continued solicitation of new lender-investors directly into Sawyer's personal CHASE account during the very months in which CHASE's Executive Office was reviewing a fraud complaint concerning the same scheme.

b. For its part, the MAS Holdings 2 x3003 account appears to have been set up primarily as a vehicle to pay Sawyer's alimony to his ex-wife, Julie Crawford, and pay credit cards. This is not a legitimate business purpose.

i. From January 2021 until it was closed at the end of December 2024, the account made twice-monthly payments in the amount of $6,500 to an account initially in both Julie Crawford's and Mark Sawyer's names and then only in Julie Crawford's name. Plaintiffs are informed and believe, and based thereon



SEREN LEGAL

SEREN LEGAL

allege, that the MAS Holdings 2 x3003 account was funded, in part, by twice-monthly transfers from the ACM North x3055 account, at least until March 2023, in the amount of $3,500 per transfer. Sawyer made fifty-three (53) such transfers totaling $185,500 from January 2021 through March 2023. The source of these funds was primarily, if not entirely, investor-provided monies.

ii. From February 2021 through February 2023, MAS Holdings 2 x3003 also received $1,000 monthly payments from Sawyer's Lighthouse Holdings Group x8683 account.

iii. Until December 2022, the only other payments going into this account were a small $500-$600 monthly payment that Plaintiffs are informed and believe, and based thereon allege, was for rent, and transfers from Sawyer's personal accounts.

iv. In December 2022, the use of the MAS Holdings Group x3003 account shifts to additional uses that should have been flagged by CHASE. For example, on December 27, 2022, Sawyer transfers $25,000 into the account and the following day transfers out $20,000 back to himself.

v. The account then returned to its usual patterns until July 2023, when it receives $6,500 from Sawyer's Wells Fargo ACM North account. This was approximately three months after Sawyer drained the CHASE ACM North account.

vi. In March 2024, Sawyer takes a $400,000 investment into the MAS Holdings Group x3003 account. At this point, Plaintiffs are informed and believe, and based thereon allege, that CHASE had received not one but two clear

SEREN LEGAL

complaints about missing investment money and advised those individuals to contact law enforcement. Further, Plaintiffs are informed and believe, and based thereon allege, that sometime between November 3 and November 13, 2023, a CHASE representative told Sonya Berg that they knew that Sawyer was a "fraud" and that Ms. Berg needed to go to the police. Plaintiffs are informed and believe, and based thereon allege, that this representative's name is Waylan with CHASE Bank Executive Service and his telephone number is 1-877-805-8049, ext. 1050004934.

vii. The following month, the account received a $9,000 deposit, which Plaintiffs are informed and believe, and based thereon allege, was for investment in the non-existent bridge loan scheme.

viii. Around this time, Sawyer also used this account to issue "partial payments" of lender-investors' funds, giving the impression that CHASE was allowing Sawyer to circumvent the "freeze" on ACM North's account by using other Sawyer-controlled accounts.

ix. CHASE should have closed Sawyer's accounts. Its failure to do so led to further loss.

c. The MAS Financing account x2914 likewise remained open at CHASE until December 24, 2024. The continued post-notice activity across x5464, x3003, and x2914 shares the defining features of the x3055 conduct that CHASE had paid more than $2.6 billion, in the Madoff resolution, to learn to detect: investor-pattern inflows, immediate layering to Sawyer-controlled and third-party accounts, same-day cash extractions, and the absence of any legitimate commercial purpose—all occurring within CHASE's own

systems, across accounts that CHASE's own Know Your Customer records affirmatively linked to the same customer and the same enterprise. The November 2023 Berg complaint did not mark the end of CHASE's facilitation of the Sawyer scheme. It marked the midpoint. CHASE's substantial assistance to the scheme continued, without interruption, into late 2024.

***L. Sawyer's Conversion of Investor Funds to Firearms and Ammunition Through CHASE Credit Account x2406***

88. Documentary records produced in response to subpoena establish a four-step chain of investor fund conversion that CHASE processed in its entirety. First, investor wire transfers bearing fraudulent real estate purchase notations were credited by CHASE as beneficiary bank to ACM North checking account x3055. Second, Sawyer caused CHASE to transfer $18,186,988 from x3055 to his personal CHASE checking account x5464 through intra-bank book transfers, all processed within CHASE's own systems. Third, Sawyer made payments from x5464 to his CHASE Sapphire Reserve credit card account x2406; the x5464 statement records confirm these payments by name as "Payment To Chase Card Ending IN 2406." Fourth, the credit in x2406 was used to purchase firearms, ammunition, and tactical equipment at seventeen distinct vendors between January 2021 and July 2022. All four steps of this conversion chain occurred on CHASE's own infrastructure and were visible to CHASE's compliance systems at each and every step.

89. The firearms purchasing pattern provides direct, documentary evidence of the purpose to which Plaintiffs' funds were applied. The pattern corroborates the timeline of the scheme's collapse: all forty firearms charges occurred between January 2021 and July 2022, during the peak period of investor wire receipts into ACM North x3055. After July 2022, as ACM

SEREN LEGAL

North's available funds collapsed, firearms purchases ceased entirely, a direct temporal correlation between the availability of investor funds and the discretionary expenditure pattern they financed. The ATF Form 4473 records held by each FFL dealer named in the transaction record identify the specific firearms transferred to Sawyer, and each such firearm constitutes a tangible asset acquired with converted investor funds that is subject to levy in enforcement of the judgments held by certain victims of the scheme.

***M. Plaintiffs' Transactions with ACM North Through CHASE***

90. Plaintiff JOHN KAHAKILI MENDONCA tendered $1,500,000 to ACM North's CHASE account x3055 via the following wire transfers:

| Date | Amount | IMAD # | Transaction # |
|---|---|---|---|
| 8/27/21 | $200,000 | 0827Mmqfmpqh000098 | 0593990239Ff |
| 8/27/21 | $50,000 | 0827Mmqfmpqh000099 | 0594470239Ff |
| 10/1/21 | $250,000 | 1001Mmqfmpqh000461 | 1148050274Ff |
| 1/20/22 | $100,000 | 0120Mmqfmpqh000323 | 0773180020Ff |
| 3/21/22 | $50,000 | 0321Mmqfmpqh000202 | 0698810080Ff |
| 4/8/22 | $500,000 | 0408Mmqfmpqh000358 | 0890400098Ff |
| 5/31/22 | $250,000 | 0531Mmqfmpqh000398 | 1261620151Ff |
| 8/5/22 | $100,000 | 0805Mmqfmpqh000239 | 0722380217Ff |

91. Plaintiff GLACKIN, LLC tendered $1,300,000 to ACM North's CHASE account x3055 via the following wire transfer:

| Date | Amount | IMAD # | Transaction # |
|---|---|---|---|
| 4/21/22 | $1,300,000 | 0421Mmqfmpqh000165 | 0664730111Ff |

92. Plaintiffs have received no payment in return. Plaintiff MENDONCA's net principal loss is $1,500,000, and Plaintiff GLACKIN, LLC's net principal loss is $1,300,000, for a combined net principal loss of $2,800,000.

SEREN LEGAL

***N. Plaintiffs' Exhaustion of Direct Collection Remedies Against Sawyer and the Role of CHASE's Branch-Level Withdrawals in Rendering the Judgments Uncollectible***

93. Plaintiffs filed suit against Mark Anthony Sawyer and ACM North, LLC in the Santa Clara County Superior Court on May 28, 2024: Plaintiff MENDONCA in *John Mendonca v. Mark Sawyer*, *et al.*, Case No. 24CV441174, and Plaintiff GLACKIN, LLC in *Glackin, LLC v. Mark Sawyer, et al.*, Case No. 24CV439988. Plaintiffs obtained default judgments against both Sawyer and ACM North. Notwithstanding the entry of those judgments, Plaintiffs have been wholly unable to collect any portion of the amounts owed, and any further recovery from Sawyer has been stayed by Sawyer's bankruptcy: on April 29, 2026, Sawyer and his wife, Jennifer Sawyer, filed for bankruptcy in the District of Nevada, Case No. 26-12677-abl. It was through the subpoena power obtained in those Santa Clara actions that Plaintiffs later obtained Sawyer's CHASE account records, as described in the timeliness allegations below.

94. Unfortunately, the money Sawyer stole no longer exists in any recoverable form—extracted from the account at CHASE's own branch teller windows in forms—currency, cashier's checks, or other non-Fedwire instruments—that are not amenable to the forensic tracing methods available against ordinary wire transfers. CHASE's own monthly statements for the ACM North account document approximately $28,275,350 in "Other Withdrawal" line items at the x3055 account during the fraud period, of which seventy-two large-denomination withdrawal events totaling approximately $23,200,000 have been identified through forensic review. Additional "Other Withdrawal" activity across the network of Sawyer-controlled CHASE accounts identified herein adds materially to this total, subject to discovery of underlying instrument documentation. CHASE has not produced cash-out tickets, cashier's check copies, transfer authorizations, or other instrument documentation sufficient to identify

SEREN LEGAL

the underlying form of payment for the bulk of these withdrawal entries; unlike wire transfers, which generate correspondent bank records, Fedwire IMAD reference numbers, and counterparty identification that permit forensic tracing, branch-window withdrawals of currency or bank-issued negotiable instruments leave no comparable downstream record absent the bank's own production. Once CHASE's branch personnel posted those funds to Sawyer, whether as cash or as bank-issued negotiable instruments, the money became practically unrecoverable to any legal enforcement mechanism available to Plaintiffs or the other victims of the scheme. CHASE is therefore not an incidental or peripheral defendant. CHASE is the institution whose teller network physically executed the branch-level extraction transactions that rendered the existing superior court judgments against Sawyer uncollectible as a matter of practical certainty, and CHASE is the institution whose own records are necessary to reconstruct the form and disposition of those funds. The proximate cause of Plaintiffs' inability to recover from Sawyer directly is CHASE's own conduct in facilitating those withdrawals without intervention.

***O. Timeliness of the Action: Delayed Discovery, Separate Accrual, Fraudulent Concealment, and Continuing Violation***

95. This action is timely under each applicable limitations period. A federal court sitting in diversity applies the forum state's statutes of limitations and the forum state's related rules of accrual and tolling. Under California law, a claim for fraud, including a claim for aiding and abetting fraud, is governed by the three-year period of California Code of Civil Procedure section 338(d), which by its terms provides that such a cause of action is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud. A claim for conversion, and for aiding and abetting conversion, is likewise governed by section 338(c)

SEREN LEGAL

and is subject to the same discovery rule. As set forth below, Plaintiffs' claims are timely under each of these periods for three independent reasons: delayed discovery, fraudulent concealment, and the continuing nature of CHASE's wrongful conduct.

96. First, Plaintiffs' claims did not accrue until Plaintiffs discovered, or in the exercise of reasonable diligence could have discovered, the facts constituting the fraud and CHASE's role in it, and that discovery occurred well within the applicable periods preceding the filing of this action. Sawyer actively concealed the fraud from Plaintiffs and the other lender-investors by furnishing them with fabricated "loan account statements" reflecting fictitious loan terms, accruing interest, and "roll" balances, thereby representing that their invested funds remained safe and were performing as promised.

97. Plaintiffs grew suspicious of Sawyer's representations in or about May 2024 and, on May 28, 2024, filed the Santa Clara County Superior Court actions described above (Case Nos. 24CV441174 and 24CV439988). Because Sawyer claimed that the ACM North funds had been frozen and refused to provide proof of any freeze, Plaintiffs brought those actions in significant part to obtain the subpoena power with which to test that claim. Plaintiffs' suspicion of Sawyer did not, however, reveal to them the separate fact of CHASE's knowing participation in, and substantial assistance to, the fraud, which is the gravamen of the claims pleaded here against CHASE.

98. Sawyer defaulted in the Santa Clara actions, and through the subpoena power those actions afforded, Plaintiffs obtained Sawyer's CHASE account records on or about April 7, 2025 — the CHASE production later Bates-stamped SB1690066-F1. A plaintiff's suspicion of a primary wrongdoer does not, as a matter of law, place the plaintiff on notice of a financial institution's separate, knowing participation, particularly where the institution's culpable

SEREN LEGAL

conduct exists only in books and records within its exclusive control. It was not until Plaintiffs obtained and analyzed those records that the scope of CHASE's substantial assistance to Sawyer's Ponzi scheme could be known. The claims pleaded here accrued only upon Plaintiffs' discovery of CHASE's role, and this action, filed well within three years of that discovery, is timely.

99. The specific facts establishing CHASE's knowledge and substantial assistance were uniquely within CHASE's possession and were not reasonably discoverable by Plaintiffs. The intra-bank transfer web, the branch-level extractions, the systematic Know Your Customer failures across the Sawyer entity portfolio, the post-notice continuation of the scheme through x5464 and x3003, and CHASE's non-response to Ms. Berg's complaint all occurred inside CHASE's own systems and books, to which Plaintiffs had no access. Plaintiffs learned of these facts only upon review of the CHASE account records produced under subpoena in Plaintiffs' related litigation (Bates series SB1690066-F1) and the forensic analysis derived from that production. A reasonable investor exercising ordinary diligence could not have discovered CHASE's role before that production became available.

100. Independently, the limitations periods are tolled under the doctrine of fraudulent concealment. The fraud was self-concealing in nature, and Plaintiffs' ignorance of the operative facts was not the product of any want of diligence. To the extent any limitations period might otherwise be deemed to have commenced before Plaintiffs' actual discovery of the facts constituting CHASE's wrongful conduct, that period was tolled until such discovery.

101. Finally, Plaintiffs' claims are timely under the continuing-violation and continuous-accrual doctrines. CHASE's wrongful conduct was not a single, discrete act completed upon the closure of x3055 in May 2023. As set forth above, CHASE continued to provide

SEREN LEGAL

substantial assistance to the Sawyer scheme—by processing investor-pattern inflows, intra-bank layering transfers, and branch-level cash extractions across the network of open, Sawyer-controlled CHASE accounts, and by failing to investigate, freeze, report, or otherwise act upon the scheme after receiving direct actual notice in November 2023—through at least December 2024. Each act of substantial assistance, and each failure to discharge CHASE's mandatory monitoring and reporting duties in the face of known red flags, constitutes a separate and actionable wrong with its own accrual date. Because CHASE's facilitation of the scheme continued into late 2024, Plaintiffs' claims, including the three-year claims for aiding and abetting fraud and aiding and abetting conversion, are timely measured from CHASE's most recent wrongful conduct, without regard to the date on which the x3055 account was closed.

102. For each of these independent reasons, delayed discovery; the concealed and institution-specific character of the facts establishing CHASE's role; fraudulent concealment; and the continuing nature of CHASE's substantial assistance, this action is timely as to every cause of action pleaded herein. To the extent the timeliness of any claim is contended to turn on facts not apparent from the face of this Complaint, those facts are peculiarly within CHASE's possession and are properly the subject of discovery.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Aiding and Abetting Fraud
(Against Defendant CHASE and Does 1–50)

103. Plaintiffs reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as though fully set forth herein.

SEREN LEGAL

104. Mark Anthony Sawyer and ACM North, LLC committed the tort of fraud against each of the Plaintiffs. Specifically, Sawyer made materially false representations to Plaintiffs that his invested funds would be placed in short-term, secured bridge loans; that the funds were safe and would be returned with interest; and that ACM North was a legitimate lending enterprise. Each Plaintiff reasonably relied on these representations in deciding to wire funds to the ACM North CHASE account. Sawyer's representations were false when made, and Sawyer knew they were false.

105. CHASE had actual knowledge of Sawyer's fraudulent scheme. CHASE's knowledge is established through the following, individually and in combination: (a) the institutional relationship history with Sawyer and ACM North dating to 2006; (b) the inherited WaMu KYC documentation expressly linking Sawyer's personal finances to ACM North since 2008; (c) the objective, automated AML red flags generated by the ACM North account activity from January 2021 forward, each of which is attributable to CHASE's own compliance infrastructure; (d) the KYC deficiencies affecting multiple Sawyer entity accounts opened across multiple branches, reflecting institutional awareness of a multi-entity customer relationship; (e) the anomalous transactions with which CHASE provided Sawyer and ACM North, including, but not limited to, large cash deposits and withdrawals executed at teller windows; (f) the provision of a personal banker dedicated to understanding Sawyer and his businesses and serving them, as well as setting up auxiliary accounts for Sawyer-related aggregators, described in detail in paragraph 122, below; and the actual investor complaint received by CHASE's Executive Office in November 2023. *See Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal.App.4th 1138, 1145–46 (2005).

///

SEREN LEGAL

106. To the extent CHASE did not have actual knowledge, CHASE's knowledge is established through the willful blindness doctrine. Under California law, a bank that has actual notice of suspicious activity red flags—and that takes no steps to investigate them—cannot shield itself behind a formal absence of subjective knowledge. CHASE's automated AML systems processed every transaction in the ACM North account. Those systems are, as a matter of law, part of CHASE's knowledge infrastructure. A bank that deliberately fails to act on high-priority alerts generated by its own compliance systems satisfies the scienter element of aiding and abetting fraud through conscious disregard of a known, high-probability risk. *See Casey,* 127 Cal.App.4th at 1145–46.

107. CHASE provided substantial assistance to Sawyer's fraudulent scheme by: (a) maintaining the ACM North account as a receptacle for investor wire transfers over a twenty-nine-month period despite the red flags described above; (b) processing hundreds of intra-bank transfers from the ACM North account to Sawyer's personal accounts, thereby facilitating Sawyer's conversion of investor funds; (c) executing tens of millions of dollars in large-denomination branch-level withdrawals at CHASE branches in the form of currency, cashier's checks, or other non-Fedwire instruments, effectively providing Sawyer with practically untraceable proceeds of the scheme; (d) authorizing immediate anomalous transactions that would have resulted in holds for other clients; (e) collecting fees and charges on all of the foregoing transactions; and (f) failing to file Suspicious Activity Reports ("SARs") that would have triggered regulatory intervention and curtailed the scheme.

108. CHASE's assistance was a substantial factor in causing Plaintiffs' damages. But for CHASE's maintenance of the ACM North account infrastructure and its facilitation of

SEREN LEGAL

Sawyer's fund-extraction mechanisms, the scheme could not have operated at the scale it did, and Plaintiffs' losses would have been avoided or mitigated.

109. As a direct and proximate result of CHASE's aiding and abetting of Sawyer's fraud, Plaintiffs have suffered damages in the amount of $1,500,000 as to Plaintiff Mendonca and $1,300,000 as to Plaintiff Glackin, LLC, plus prejudgment interest at the maximum rate permitted by law from the date of each wire transfer, to be proven at trial.

110. CHASE's conduct in aiding and abetting the Sawyer fraud was willful, malicious, and oppressive within the meaning of California Civil Code section 3294, in that CHASE deliberately maintained its banking relationship with Sawyer despite knowledge of substantial red flags suggesting investor harm, and in that CHASE knowingly profited from the fees and float generated by a fraudulent scheme at the expense of innocent investors. Plaintiffs are therefore entitled to an award of punitive damages against CHASE in an amount sufficient to punish and deter such conduct.

**SECOND CAUSE OF ACTION**
**Aiding and Abetting Conversion**
(Against Defendant CHASE and Does 1–50)

111. Plaintiffs reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as though fully set forth herein.

112. Plaintiffs wired specific, identifiable sums of money to ACM North's CHASE account x3055 based on Sawyer's representations that the funds would be placed in secured bridge loans, for which CHASE conducted the escrow, and returned. Upon receipt, Sawyer took possession of Plaintiff's funds, converted them to his own use, and refused to return them despite demand. Sawyer's intentional assumption of dominion and control over Plaintiff's

SEREN LEGAL

property, inconsistent with Plaintiff's ownership rights, constitutes conversion under California law.

113. CHASE had actual knowledge that Sawyer was converting investor funds, for the reasons set forth in paragraphs 100 and 101 above, and described in considerable detail throughout the complaint, and incorporated herein.

114. CHASE provided substantial assistance to Sawyer's conversion of Plaintiffs' funds by: (a) receiving Plaintiffs' wire transfers as beneficiary bank and crediting them to Sawyer's ACM North account without investigation; (b) processing Sawyer's intra-bank transfer orders moving Plaintiffs' funds from the ACM North account to Sawyer's personal accounts; (c) authorizing immediate anomalous transactions that would have resulted in holds for other clients; and (d) dispensing currency and bank-issued negotiable instruments to Sawyer at CHASE branch teller windows, thereby converting Plaintiffs' electronically-traceable funds into practically untraceable forms and completing the conversion.

115. As a direct and proximate result of CHASE's aiding and abetting of Sawyer's conversion of their funds, Plaintiff has suffered damages of $1,500,000 as to Plaintiff Mendonca and $1,300,000 as to Plaintiff Glackin, LLC, plus prejudgment interest at the maximum rate permitted by law from the date of each wire transfer, and punitive damages pursuant to California Civil Code section 3294, to be proven at trial.

116. Plaintiffs also have suffered consequential damages in an amount to be proven at trial.

117. Pursuant to California Penal Code section 496(c), Plaintiff is entitled to treble damages and attorneys' fees.

///

///

SEREN LEGAL

**THIRD CAUSE OF ACTION**
**Aiding and Abetting Breach of Fiduciary Duty**
(Against Defendant CHASE and Does 1–50)

118. Plaintiffs reallege and incorporate by reference each and every allegation set forth in all preceding paragraphs as though fully set forth herein.

119. Sawyer owed Plaintiffs and the other lender-investors a fiduciary duty, which he breached by soliciting for "investments" that, in fact, were going to a Ponzi scheme, whereby Sawyer and his family enriched themselves and Sawyer used the remaining funds to pay back earlier investors.

120. CHASE knew that Sawyer solicited investments. Many investors deposited their funds directly into Sawyer's accounts via CHASE tellers. Plaintiffs are informed and believe, and based thereon allege, that such investors include, but are not limited to, MESH Investments, LLC; Trivian, LLC; Morpheus Investments, LLC; Bantam Investment Holdings, LLC; and Vesta Systems, LLC, among many others.

121. Plaintiffs are informed and believe, and based there on allege, that the investors named in the preceding paragraph acted as aggregators for other investors (hereinafter, "Aggregator Accounts"). Plaintiffs are informed and believe, and based thereon allege, that, in addition to the investors named in the preceding paragraph, the following entities also acted as aggregator accounts: D3 Investments, LLC; DIG Investors, LLC; Light the Way Solutions, LLC; and TSTW Secondary, LLC. Plaintiffs are informed and believe, and based thereon allege, that ***<u>all</u>*** of the Aggregator Accounts listed in the preceding paragraph and in this paragraph had accounts with CHASE. Further, Plaintiffs are informed and believe, and based thereon allege, that numerous individuals who provided their money to an Aggregator Account to be provided to ACM North also had accounts with CHASE. This means that CHASE had four

SEREN LEGAL

levels of involvement on many transactions: the investor with a CHASE account would deposit their money with an aggregator account with a CHASE account, who, in turn, would deposit the money with ACM North's CHASE account, whereupon Sawyer would often divert the funds other CHASE accounts controlled by Sawyer.

122. Plaintiffs are informed and believe, and based thereon allege, that in or around April 15, 2015, Sawyer met two individuals who functioned as aggregators at the Brokaw Road branch to introduce them to Sawyer's personal CHASE banker there. Plaintiffs are informed and believe, and based thereon allege, that Sawyer's personal banker assisted the two aggregators with setting up their own accounts. Plaintiffs are informed and believe, and based thereon allege, that the personal banker knew the purposes of the Aggregator Accounts he set up and that these accounts were designed to feed more money into Sawyer's ACM North account.

123. Additionally, Plaintiffs are informed and believe, and based thereon allege, that most lender-investors indicated on their wires and checks that such deposits were for the purposes of bridge loans or other investments. CHASE knew that Sawyer owed the lender-investors a fiduciary duty to act with the utmost good faith and in the best interests of those lender-investors.

124. Further, when a wire is issued, a purpose must be stated for the wire. From January 2021 until the ACM North x3055 account closed in May 2023, 405 wires (215 inbound and 190 outbound) included as part of their statement of purpose some variation on "bridge loan," "investment," "lending," "business loans," "bridge funds," "bridge disbursement," "bridge distribution," or "bridge payout." Some of the incoming wires even stated the terms of the bridge loan as part of the purpose. For example, a $15,000 incoming wire on June 4, 2021,

bore the description, "Lending 21 percent 80 days." There are multiple other similar examples.

125. CHASE also knew that Sawyer was breaching his fiduciary duty to the lender-investors. Such knowledge was obtained, at least in part, by and through by: (a) maintaining the ACM North account as a receptacle for investor wire transfers over a twenty-nine-month period despite the red flags described above; (b) processing hundreds of intra-bank transfers from the ACM North account to Sawyer's personal accounts, thereby facilitating Sawyer's conversion of investor funds; (c) executing tens of millions of dollars in large-denomination branch-level withdrawals at CHASE branches in the form of currency, cashier's checks, or other non-Fedwire instruments, effectively providing Sawyer with practically untraceable proceeds of the scheme; (d) collecting fees and charges on all of the foregoing transactions; and (e) failing to file Suspicious Activity Reports ("SARs") that would have triggered regulatory intervention and curtailed the scheme.

126. Instead of exposing Sawyer's Ponzi scheme, CHASE opted to provide substantial assistance instead, thereby causing harm to hundreds, if not thousands, of individuals.

127. CHASE's substantial assistance was the actual and proximate cause of Plaintiffs' losses. Had CHASE declined to provide that substantial assistance—by filing required SARs, investigating the documented red flags, or taking account action following the investor complaint—the Sawyer scheme would have been curtailed and Plaintiffs' losses would have been avoided or reduced.

128. As a direct and proximate result of CHASE's aiding and abetting of Sawyer's breach of fiduciary duty, Plaintiffs have suffered damages of $1,500,000 as to Plaintiff Mendonca





SEREN LEGAL

SEREN LEGAL

and $1,300,000 as to Plaintiff Glackin, LLC, plus prejudgment interest and costs, to be proven at trial.

129. Plaintiffs also have suffered consequential damages in an amount to be proven at trial.

130. Plaintiffs are entitled to recover Plaintiffs' reasonable attorneys' fees pursuant to California Code of Civil Procedure section 1021.5, as this action enforces an important public right—specifically, the obligation of federally regulated financial institutions to implement and maintain AML compliance systems that protect members of the investing public from Ponzi scheme fraud—confers a significant benefit on the general public and a large class of persons beyond Plaintiffs, and necessitates private enforcement because the regulatory and enforcement resources of FinCEN and the OCC have not been directed to the ACM North scheme.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant JPMorgan Chase Bank, N.A., and Does 1 through 50, inclusive, and award the following relief:

**First Cause of Action**

1. Compensatory damages in the amount of $1,500,000 as to Plaintiff Mendonca and $1,300,000 as to Plaintiff Glackin, LLC representing Plaintiffs' loss as a result of the conduct alleged herein, in the precise amount to be proven at trial; and
2. Punitive and exemplary damages against CHASE pursuant to California Civil Code section 3294 in an amount sufficient to punish CHASE for its malicious, oppressive, and willful

conduct, and to deter CHASE and other financial institutions from engaging in similar conduct in the future.

**Second Cause of Action**

1. Compensatory damages in the amount of $1,500,000 as to Plaintiff Mendonca and $1,300,000 as to Plaintiff Glackin, LLC representing Plaintiff's loss as a result of the conduct alleged herein;
2. Consequential damages in an amount to be proven at trial.
3. Emotional distress damages as a result of Defendants' conduct;
4. Plaintiff's reasonable time and expenses, including attorneys' fees, incurred in attempting to recover the money pursuant to Cal. Penal Code § 496(c); and
5. Treble damages pursuant to Cal. Penal Code § 496(c).

**Third Cause of Action**

1. Compensatory damages in the amount of $1,500,000 as to Plaintiff Mendonca and $1,300,000 as to Plaintiff Glackin, LLC representing Plaintiff's loss as a result of the conduct alleged herein, in the precise amount to be proven at trial;
2. Consequential damages in an amount to be proven at trial; and
3. Punitive and exemplary damages against CHASE pursuant to California Civil Code section 3294 in an amount sufficient to punish CHASE for its malicious, oppressive, and willful conduct, and to deter CHASE and other financial institutions from engaging in similar conduct in the future.

///

///

SEREN LEGAL

**All Causes of Action**

1. Prejudgment interest at the maximum rate permitted by law on all compensatory damages from the date of each of Plaintiffs' wire transfers;
2. Reasonable attorneys' fees and costs of suit pursuant to California Code of Civil Procedure section 1021.5 and to the extent otherwise permitted by law; and
3. Such other and further relief as the Court deems just and proper.

Dated: August 2, 2026

**SEREN LEGAL**

By: __/s/ K. Kasey Corbit________________
K. Kasey Corbit, Attorney for Plaintiffs
JOHN KAHAKILI MENDONCA and
GLACKIN, LLC

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: August 2, 2026

**SEREN LEGAL**

By: __/s/ K. Kasey Corbit_________________
K. Kasey Corbit, Attorney for Plaintiffs
JOHN KAHAKILI MENDONCA and
GLACKIN, LLC